1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   ANTHONY HILL,                          Civil No.    09cv1327-LAB (CAB)

                                Petitioner,
12                                           REPORT AND RECOMMENDATION TO
                                             DENY PETITION FOR WRIT OF
13            v.                             HABEAS CORPUS

     DOMINGO URIBE, Warden,
14
                                Respondent.
15

16

17        This Report and Recommendation is submitted to United States District Judge Larry Alan

18   Burns pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District

19   Court for the Southern District of California.

20                            I.  PROCEDURAL HISTORY

21        Anthony Hill (hereinafter "Petitioner") is a state prisoner who is proceeding pro se with a

22   Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.

23   [Doc. No. 1.] Petitioner challenges his San Diego County Superior Court conviction of two

24   counts of robbery (Cal. Penal Code § 211), claiming that his federal constitutional rights were

25   violated because: (1) his trial attorney was ineffective (in violation of his Sixth Amendment

26   rights); (2) the trial judge improperly denied motions for new trial and mistrial based on alleged

27   prosecutorial misconduct; (3) petitioner has discovered three witnesses who could provide

28   evidence to exonerate him and establish that he is actually innocent. [Doc. No. 1 at 6-8.]

                                         1

1   On November 16, 2009, Respondent filed an Answer to the Petition and a Memorandum

2   of Points and Authorities in support of the Answer, and has lodged a portion of the state record.

3   [Doc. No. 16.] Respondent contends that the Petition is barred by AEDPA's statute of

4   limitations. [Doc. No. 16-1 at 15 - 20.] Respondent further contends that the California Court of

5   Appeal reasonably and properly rejected all of Petitioner's claims. [Doc. No. 16-1 at 20-37.]

6   On January 20, 2010, Petitioner filed a Traverse. [Doc. No. 21.]

7   II.  STATE PROCEEDINGS

8   In a two-count Information filed in San Diego Superior Court on February 19, 2003,

9   Petitioner was charged with two counts of robbery (Cal. Penal Code § 211).  It was further

10  alleged that in the commission of those counts, Petitioner intentionally and personally discharged

11  a firearm and proximately caused bodily injury (Cal. Penal Code § 12022.53(d)).  Finally, it was

12  also alleged that Petitioner had two prison prior convictions (Cal. Penal Code §§ 667.5(b) and

13  668), two serious felony prior convictions (Cal Penal Code §§ 667(a)(1), 668, and 1192.7(c)),

14  and two prior strike prior convictions (Cal Penal Code §§667(b) - (i), 1170.12, and 668).

15  [Lodgment 1 at 1-4.]

16  On May 2, 2003, a jury convicted Petitioner of two counts of robbery and found that

17  Petitioner personally and intentionally discharged a firearm, causing great bodily injury to one of

18  his victims. [Lodgment 1 at 54-55.] In a bifurcated proceeding, the trial judge found true the

19  allegations that Petitioner had two prison prior convictions, two serious felony prior convictions

20  and two prior strike convictions. [Lodgment 1 at 179-180; Lodgment 2 at 519.]

21  On October 8, 2003, the trial court sentenced Petitioner to 132 years to life in state prison.

22  [Lodgment 1 at 154-155; Lodgment 2 at 590.]

23  On June 11, 2004, Petitioner filed a direct appeal, raising the claim that the prosecutor

24  engaged in misconduct and violated Petitioner's Sixth Amendment right to confrontation.

25  [Lodgment 3 at 6-14.] The state appellate court rejected the claim; it found that there was

26  prosecutorial misconduct but that it was not prejudicial, and therefore it was not error for the

27  state trial court to deny the motion for mistrial based on prosecutorial error. [Lodgment 5 at 24.]

28  On April 20, 2005, the California Supreme Court, *en banc*, denied review. [Lodgments 6

and 7, Case No. S132142.]

On July 26, 2005, Petitioner filed a Petition for Writ of Habeas Corpus in the California Superior Court, San Diego County, case no. HC18239, raising claims of newly discovered exonerating witnesses, suggestive identification procedures, and ineffective assistance of counsel. [Lodgment 8.]  On September 28, 2005, the California Superior Court denied the petition for habeas relief. [Lodgment 9.]

On October 19, 2005, Petitioner filed a "Motion for Reconsideration of Habeas Corpus." [Lodgment 10.]  On November 3, 2005, the California Superior Court denied the motion for reconsideration. [Lodgment 11.]

On January 4, 2006, Petitioner filed a Petition for Writ of Habeas Corpus in the California Court of Appeal, case no D047782, raising the same claims raised in the Superior Court habeas petition. [Lodgment 12.] On June 19, 2006, Petitioner filed a request to withdraw the January 4, 2006 petition; that request was granted on June 29, 2006, and the petition was dismissed. [Lodgment 13.]

On December 3, 2007, Hill filed a second Petition for Writ of Habeas Corpus in the state appellate court, again raising claims of alleged ineffective assistance of counsel, alleged illegal sentence, allegedly suggestive identification and "newly discovered exonerating witnesses." [Lodgment 14, California Court of Appeal case number D052101.]  On March 25, 2008, the California Court of Appeal denied the second petition. [Lodgment 16.]

On April 25, 2008, Petitioner filed a third habeas corpus petition in the state appellate court, again raising claims of ineffective assistance of counsel, suggestive identification procedures, and newly discovered exonerating evidence. [Lodgment 17, California Court of Appeal case number D052902[1].] On May 15, 2008, the state appellate court denied the third habeas petition. [Lodgment 18.]

On July 9, 2008, Petitioner filed a habeas petition in the California Supreme Court, and raised the following claims: (1) ineffective assistance of trial counsel; (2) alleged illegal sentence; (3) allegedly suggestive photo lineup and identification testimony in violation of due

---

[1]Lodgment 17 has a different handwritten case number (D052101), but presumably is the petition filed on April 25, 2008, and referenced by the appellate court in Lodgment 18.

1    process under the Fourteenth Amendment; and (4) a claim of actual innocence based on "newly

2    discovered exonerating witnesses." [Lodgment 19, California Supreme Court case number

3    S164946, at 9-26.] On December 17, 2008, the California Supreme Court denied the petition.

4    [Lodgment 20.]

5         On March 13, 2009, Petitioner filed a fourth habeas petition in the state appellate court,

6    claiming ineffective assistance of appellate counsel. [Lodgment 21, California Court of Appeal

7    case number D054746.] On April 28, 2009, the California Court of Appeal denied the fourth

8    petition. [Lodgment 22, California Court of Appeal case number D054746.]

9                             III.  UNDERLYING FACTS

10        This Court gives deference to state court findings of fact and presumes them to be correct.

11   See 28 U.S.C. § 2254(e)(1); see also Parke v. Raley, 506 U.S. 20, 35-36, 113 S.Ct. 517, 121

12   L.Ed.2d 391 (1992) (holding findings of historical fact, including inferences properly drawn

13   from these facts, are entitled to statutory presumption of correctness). The relevant facts as found

14   by the state appellate court are as follows:

15            *A.  The People's Case*
         In the early morning hours of July 14, 2002, the victims in this case, Dan
16   Naslund and Carl Swan, who were tourists from Sweden, were on the boardwalk
     in Mission Beach by the public restroom near the roller coaster.  They had been
17   drinking beer and tequila at some local bars since the mid-afternoon.  Naslund
     testified that he was very drunk.
18            Naslund and Swan met two young Black women, as well as a Black man
     who was shorter than Naslund.  The Black man talked to Naslund and Swan about
19   buying sex from the two women.  Naslund testified that they told the Black man
     they were not interested, and then he (Naslund) and Swan walked away and went
20   to the public toilets by the boardwalk.
              While Naslund and Swan were in the bathroom, the Black man approached
21   Naslund and pointed a gun at him.  The man demanded and took all of Naslund's
     money and his passport, bracelet and necklace.
22            Swan testified that when he came out of another stall in the bathroom, he
     saw that the same man they had been talking to outside was pointing a gun at
23   Naslund, and he realized that he and Naslund were being robbed.  Swan thought to
     himself, "I have to remember this guy."  Before his 2002 visit to San Diego, Swan
24   had been studying at the Swedish police academy and had learned how to
     recognize the perpetrator of a crime by staying calm and then looking for specific
25   characteristics such as the hairline, eyes, eyebrows, mouth, nose and the whole
     body, as well as the perpetrator's language, attitude, accent, and manner of acting.
26   During the robbery, Swan applied what he had learned at the academy.
              The Black man took Swan's money, a necklace, a watch, and a camera.
27   The man then ordered Naslund and Swan to strip down to their underwear and lie
     on the floor.  After they complied, the man shot Swan in the knee and ran away.
28            San Diego Police Officer Albert Pottin testified that he responded to a call
     made by a nearby youth and found Swan lying on the sidewalk near the roller
     coaster with blood all over his left leg.  Swan told Officer Pottin that he had been

                                          4

shot by a Black male in his 30's who was thin, weighed about 160 pounds, and was about 170 to 175 centimeters (about five feet six inches to five feet eight inches tall.[2]  The parties stipulated that Hill is just under five feet six inches tall.

San Diego Police Officer Mari Kong testified that she arrived at the crime scene at around 3:30 a.m.  She secured the crime scene at the bathroom, and then interviewed Doxey, a female witness.  When shown a photograph marked as court exhibit No. 5, Officer Kong testified that it was a photograph of Doxey, whom she had interviewed at the crime scene.

Swan testified that after he returned to Sweden, doctors removed most of the bullet from his knee, and he mailed it to Detective Jeffrey Steele in San Diego.  At the time of trial, his knee still hurt, and it still contained fragments of the bullet.

At trial, Naslund remembered that the two women he and Swan had met at Mission Beach were Black, but he could not recall anything specific about them.  He testified that about three months later, in October 2002 after he returned to Sweden, Detective Steele sent him a photographic lineup that contained photographs of six individuals, including the suspect, Hill.  Hill was depicted in photo No. 5.  Naslund testified that he opened the photo lineup in the presence of his girlfriend, Caryna, and immediately recognized the person in photo No. 5 as the robber.  He also testified that when he looked at the photograph, he was not sure that the man shown in it was the robber, but his first thought was that the man in the photograph was the robber, and he told Caryna: "It's No. 5.  That's him.  That's the guy."  Naslund circled photograph No. 5 and later sent the photo lineup back to Detective Steele in the return envelope he had provided.  At the trial, Naslund also identified Hill, who was present in the courtroom, as the robber.

Detective Steele also mailed the same photo lineup to Swan after he returned to Sweden.  During an August 2002 telephone conversation with Swan, Detective Steele told him that the police knew who had shot him and informed Swan that he would be receiving a photo lineup.  In October 2002, after he received the photo lineup, Swan circled Hill's photograph (photo No. 5), signed his (Swan's) name and wrote the date at the bottom, wrote "I choose No. 5," and returned the photo lineup to Detective Steele.  At trial, Swan testified that he circled Hill's photograph because "[t]hat's the guy who was on the beach, we talked by the wall, and that's the guy in the restroom, and that's the guy who robbed and shot me."  At trial, Swan again identified Hill as the robber.

At trial, Swan also described the two Black women that he and Naslund had met in Mission Beach.  He stated that one was tall with "kind of curly" black, shoulder-length hair dressed in a black top and dark shorts; and the other was shorter and bigger.  Swan indicated that the woman shown in a photograph marked as court exhibit No. 5 was the tall woman, and he recognized the woman shown in another photograph marked as court exhibit No. 6 as the shorter, bigger woman.  As already discussed, Officer Kong testified that the photograph marked as court exhibit No. 5 depicted Doxey.  Hill's uncle, Johnie Hill, identified the woman depicted in court Exhibit No. 6 as the woman that Hill had introduced to him as his wife, Patricia[3] Hill.

B.  *The Defense*

Johnie Hill testified on behalf of Hill that from early July to late September of 2002, Hill continuously lived in Long Beach, caring for his blind and disabled grandmother (Johnie Hill's mother).  Johnie Hill admitted he had been convicted in 1982 of aiding and abetting a federal bank robbery, and he had been convicted of other felonies in San Diego.

The defense also called Dr. Thomas MacSpeiden, a psychologist and an

---

[2][Footnote in original] The court took judicial notice of the fact that 170 centimeters was "just a shade" under five feet seven inches, and 175 centimeters was five feet eight and seven-eighths inches.

[3][Footnote in original] The record shows that her name is Patrice Hill.

09cv1327

1      expert on eyewitness identification, who testified about the fallibility of eyewitness
     identification.
2 [Lodgment 5 at 2-6.]

3                            IV.  DISCUSSION

4 A.  <u>Standard of Review</u>

5      A federal court may not grant an application for writ of habeas corpus on behalf of a

6 person in state custody with respect to any claim that was adjudicated on the merits in state court

7 proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to,

8 or involved an unreasonable application of, clearly established Federal law, as determined by the

9 Supreme Court of the United States"; or (2) "resulted in a decision that was based on an

10 unreasonable determination of the facts in light of the evidence presented in the State court

11 proceeding." 28 U.S.C. § 2254(d); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-26 (2002); <u>Early v.</u>

12 <u>Packer</u>, 537 U.S. 3, 8 (2002); <u>Williams v. Taylor</u>, 529 U.S. 362, 405-09 (2000).

13      "Clearly established Federal law" refers to the governing legal principle or principles set

14 forth by the Supreme Court at the time the state court renders its decision. <u>Lockyer v. Andrade</u>,

15 538 U.S. 63 (2003). A state court's decision is "contrary to" clearly established Federal law if:

16 (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of

17 facts ... materially indistinguishable" from a decision of the Supreme Court but reaches a

18 different result. <u>See</u> <u>Early v. Packer</u>, 537 U.S. at 8 (citation omitted); <u>Williams v. Taylor</u>, 529

19 U.S. at 405-06.

20      Under the "unreasonable application prong" of section 2254(d) (1), a federal court may

21 grant habeas relief "based on the application of a governing legal principle to a set of facts

22 different from those of the case in which the principle was announced." <u>Lockyer v. Andrade</u>, 538

23 U.S. at 76 (citation omitted); <u>see also</u> <u>Woodford v. Visciotti</u>, 537 U.S. at 24-26 (state court

24 decision "involves an unreasonable application" of clearly established federal law if it identifies

25 the correct governing Supreme Court law but unreasonably applies the law to the facts). A state

26 court's decision "involves an unreasonable application of [Supreme Court] precedent if the state

27 court either unreasonably extends a legal principle from [Supreme Court] precedent to a new

28 context where it should not apply, or unreasonably refuses to extend that principle to a new

context where it should apply." <u>Williams v. Taylor</u>, 529 U.S. at 407 (citation omitted).

            09cv1327

1    "In order for a federal court to find a state court's application of [Supreme Court]

2    precedent 'unreasonable,' the state court's decision must have been more than incorrect or

3    erroneous." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (citation omitted). "The state court's

4    application must have been 'objectively unreasonable.' " Id. at 520-21 (citation omitted); see also

5    Clark v. Murphy, 331 F.3d 1062, 1068 (9th Cir.), cert. denied, 540 U.S. 968 (2003). In applying

6    these standards, this Court looks to the last reasoned state court decision, here the decision of the

7    Court of Appeal. See Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir.2008).

8    B.   The question of whether the petition is barred by the statute of limitations need not be

9    addressed, as this court recommends that the petition be denied on the merits.

10    Respondent argues that the petition is barred by AEDPA's statute of limitations, as the

11    petition was filed well after the limitations period expired and petitioner does not qualify for

12    statutory or equitable tolling. [Doc. No. 16-1 at 15 - 20.] Petitioner argues that Respondent

13    waived his right to claim a procedural bar because he did not file a motion to dismiss within the

14    time deadline set by this court. [Doc. No. 21 at 3.]

15    As a general rule, the statute of limitations is a threshold issue to be resolved before the

16    merits of individual claims. See White v. Klitzkie, 281 F.3d 920, 921-22 (9th Cir.2002).

17    However, a federal court is not required to rule on the statute of limitations bar if the petition

18    may be denied on other grounds. Pough v. United States, 442 F.3d 959, 965 (6th Cir.2006); cf.

19    Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir.2002) (federal courts are authorized to skip a

20    relatively complicated procedural default question and proceed to deny the claim on the merits);

21    cf. Carr v. Cigna Securities, Inc., 95 F.3d 544, 547 (7th Cir.1996) (choosing to "skip over the

22    tangled statutes of limitations issues" to "come directly" to the merits of the claims).  This Court

23    finds that the interests of the parties would be best served by avoiding what appears to be a

24    complex statute of limitations analysis and rendering a decision on the merits of the petition.

25    C.   Petitioner is not entitled to habeas relief on his claim that his state trial attorney was

26    ineffective.

27    Petitioner argues that his state trial attorney was ineffective by (1) putting on an alibi

28    witness who, in fact, could not supply him with an alibi, and, instead, became an adverse witness

against him, and (2) failing to object to a suggestive in-court identification procedure. [Doc. No.

7                                                            09cv1327

1 at 6.] Respondent argues that the claim related to the alibi defense was reasonably decided by

the California Courts. [Doc. No. 16-1 at 20.]  Respondent further argues that the claim related to

the identification of Petitioner's wife has not been exhausted but, nevertheless, is without merit.

[Doc. No. 16-1 at 20-21.]

1.  Alibi defense.

Specifically, Petitioner claims "[t]he decision to put petitioner's uncle, Johnie Hill, on the

stand as an alibi witness can arguably be considered the most damaging mistake made by

petitioner's attorney (Epley) during the trial." [Doc. No. 1-1 at 9.] "The closest petitioner's uncle

came to actually providing an alibi was on cross-examination when he testified that petitioner

called him from his mother's house on the morning of July 14th, at 'about 8:30, 9:00." Id at 10.

(citations omitted.)  According to Petitioner, had his trial counsel done an adequate pretrial

interview of Mr. Hill, "he would have realized that even if it were believed by the jury, this so-

called alibi would not have sufficed in any way, since it left a 4-5 hour window for petitioner to

commit the crime, drive back to his grandmother's house in Long Beach, and call his uncle at the

time stated."  Id.  Moreover, Petitioner argues that trial counsel "had to have known that Hill

would end up as an adverse witness against petitioner," because through Mr. Hill's testimony,

the prosecution was able to provide evidence that one of the women seen at the scene of the

crime was the Petitioner's wife. [Doc. No. 1-1 at 10.]

Respondent argues that trial counsel provided a reasonable defense by putting on

Petitioner's uncle's testimony to provide an alibi, and by calling an expert witness to challenge

the eyewitness testimony. [Doc. No. 16-1 at 21.] In addition, respondent argues that trial counsel

did a reasonable investigation to find other alibi witnesses, but could find none. [Doc. No. 16-1

at 22.] Finally, respondent argues that the fact "[t]hat there was no boy-scout type witness to

provide an alibi for Hill was no fault of defense counsel." [Id.]

Petitioner presented his claim relating to the alibi defense to the state supreme

court in the petition for review. [Doc. No. 1 at 6; Lodgment 19 at 3.] The California Supreme

Court summarily denied the petition for review. [Lodgment No. 20.] In Y1st v. Nunnemaker,

501 U.S. 797, 804 (1991), the Court adopted a presumption which gives no effect to unexplained

state court orders but "looks through" them to the last reasoned state court decision.  Petitioner

09cv1327

presented his claim to the appellate court in the same fashion it was presented to the state

supreme court. [Lodgment 17 at 9-11; Lodgment 19 at 3.] The appellate court denied the claim

in a reasoned opinion. [Lodgment 18 at 3-4.][4]

The Court will therefore look through the silent denial by the state supreme court to the

appellate court opinion.  The appellate court stated:

> Regarding Hill's ineffective assistance of trial counsel claim, Hill has not
> stated facts or presented evidence showing that his trial counsel's performance was
> both: (1) deficient under an objective standard of professional reasonableness; and
> (2) prejudicial such that there was a reasonable probability of a different outcome.
> (*Strickland v. Washington* 91984) 466 U.S. 668, 687; *People v. Weaver* (2001) 26
> Cal.4th 876, 961.)  Although Hill contends his trial counsel failed to object at key
> points in the trial, the trial court carefully analyzed this contention at the hearing
> on Hill's new trial motion.  The trial court found that, even if trial counsel had
> performed deficiently, the deficiency had not prejudiced the trial result.  Hill has
> not stated any facts or presented any evidence that undermines the trial court's
> finding.
> Further, while Hill contends that his trial counsel failed to investigate other
> potential alibi witnesses, the record provided by Hill does not support this
> contention.  To the contrary, the record contains two reports from trial counsel's
> investigator showing that trial counsel contacted Hill's aunt and sister to determine
> if either one could provide an alibi for the date and time of the robberies.  Neither
> could.

[Lodgment 18 at 3-4.]

To prevail on a claim for ineffective assistance of counsel, Petitioner must first establish

that counsel's performance was deficient, i.e., that it fell below an "objective standard of

reasonableness" under prevailing professional norms. Strickland v. Washington, 466 U.S. 668,

687-88 (1984). Judicial scrutiny of counsel's performance must be highly deferential, and a court

must indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance. See id. at 689. Second, Petitioner must establish that he was

prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different."

Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the

outcome. See id.  In order to demonstrate prejudice, Petitioner need only show a reasonable

probability that the result of the proceeding would have been different absent the errors. See

Williams, 529 U.S. at 406; Strickland, 466 U.S. at 694. The court considers the prejudice inquiry

---

[4] Petitioner also presented this claim to the San Diego Superior Court in the first state
habeas petition filed on July 26, 2008 [Lodgment 8], and the superior court denied the claim
[Lodgment 9].

1  in light of the strength of the prosecution's case. <u>Luna v. Cambra</u>, 306 F.3d 954, 966 (9th Cir.),

2  amended, 311 F.3d 928 (9th Cir.2002).

3      Here, a review of the underlying record shows that Petitioner's trial counsel provided a

4  reasonable defense by, among other things,  trying to establish an alibi for the Petitioner. The

5  uncle testified that Petitioner lived continuously in Long Beach from early July to late September

6  of 2002 and that Petitioner cared for his blind and disabled grandmother.  [Lodgment 2 at 256-

7  270.] While the uncle did admit that he (the uncle) had been convicted of certain felonies, it was

8  not necessarily error to put on the uncle's testimony, as the alternative was to have no alibi

9  testimony, because no other alibi witnesses were available to counsel.

10     Counsel has a duty to make reasonable investigations or to make a reasonable decision

11 that would render an investigation unnecessary. <u>Strickland</u>, 466 U.S. at 691. The duty to

12 investigate, however, is not limitless and not every conceivable witness needs to be interviewed.

13 <u>Hendricks v. Calderon</u>, 70 F.3d 1032, 1040 (9th Cir.1995).  In determining whether counsel's

14 conduct falls within the broad range of professionally acceptable conduct, this Court will not

15 view counsel's actions through "the distorting lens of hindsight." <u>Deutscher v. Whitley</u>, 884 F.2d

16 1152, 1159 (9th Cir.1989), <u>vacated on other grounds</u>, <u>Angelone v. Deutscher</u>, 500 U.S. 901, 111

17 S.Ct. 1678, 114 L.Ed.2d 73 (1991). Rather, under the rule of contemporary assessment, an

18 attorney's actions must be examined according to what was known and reasonable at the time the

19 attorney made his choices. <u>Id</u>.

20     Here, trial counsel's investigator interviewed other potential alibi witnesses (including

21 Petitioner's aunt and sister) to see if they could provide an alibi for the date and time of the

22 robberies, but none of them could. [Lodgment 18 at 3-4; Lodgment 8, Witness interviews by

23 investigator Bryan Castrejon taken during the 3/03 to 4/03 time frame (exhibits to Lodgment 8).]

24 Petitioner's uncle was the only witness willing to testify and provide an alibi near the time of the

25 robberies.  [Lodgment 2 at 256-270.]   Given the choices trial counsel had at the time with regard

26 to potential alibi witnesses, it was not an unreasonable decision to put on the uncle's testimony.

27 Strategic trial decisions, such as whether to call a particular witness at trial, "rest[ ] upon the

28 sound professional judgment of the trial lawyer,"  <u>Gustave v. United States</u>, 627 F.2d 901, 904

(9th Cir.1980), and appropriately informed strategic choices "are virtually unchallengeable."

09cv1327

1   Strickland, 466 U.S. at 690, 104 S.Ct. 2052.

2         Moreover, Petitioner is unable to show prejudice from trial counsel's decision to call the

3   uncle, as the other evidence against Petitioner was strong.  The court considers the prejudice

4   inquiry in light of the strength of the prosecution's case.  Luna v. Cambra, 306 F.3d 954, 966 (9th

5   Cir.), amended, 311 F.3d 928 (9th Cir.2002).  Here, both of the victims were able to identify

6   Petitioner from a photo lineup and in court. [Lodgment 2 at 79-85, 183-186.]  One of the

7   victims, Swan, had received special training on identifying criminals at the Swedish police

8   academy, and he provided particularly compelling testimony about how he was able to use his

9   training to remember certain identifying factors about the Petitioner. [Lodgment 2 at 119, 140-

10  145. ] In addition, the uncle's testimony was not the only evidence linking Petitioner's wife to

11  the robberies.  Swan also identified Exhibit 6 as the photograph of one of the two women that he

12  and Naslund met immediately before they were robbed. [ Lodgment 2 at 127-128. ] Also, the

13  jury was provided with a certified copy of Patrice Hill's DMV printout.  [Lodgment 2 at 289. ]

14  In light of the evidence against Petitioner, counsel's decision to call the uncle and not call the

15  other potential witnesses was reasonable and not prejudicial.  See Strickland, 466 U.S. at 687,

16  694; see also Gustave v. United States, 627 F.2d 901, 904 (9th Cir.1980) (holding decision to

17  subpoena witnesses rest upon sound professional judgment of trial lawyer).  Accordingly, the

18  Court finds that the California court's rejection of Petitioner's claim was neither contrary to, nor

19  involved an unreasonable application of, clearly established federal law, as determined by the

20  United States Supreme Court. Thus, habeas relief is not warranted on this claim.

21        2.  In-court Identification.

22        Petitioner claims that his trial counsel's failure to object to, and attempt to preclude, the

23  identification by Carl Swan of Michelle Hill (by identifying her in court as the woman in Exhibit

24  6) constitutes ineffective assistance of counsel. [Doc. No. 1-1 at 13.]  Specifically, Petitioner

25  alleges as follows:

26             During a discussion with the Trial Court, outside the presence of the jury,
           the prosecutor explained that he needed to "talk to a witness (Carl Swan) and see if
27         it – on [sic] of the victims – and see if they can recognize the picture of Miss Hill."
           (R.T. 41:11-13) Defense counsel, Epley, was well aware, at the time, of the fact
28         that the picture he was referring to was the exact same photo used in the lineup that
           Swan, months earlier, was unable to make an I.D. from despite the fact that he had
           it in his possession for "two months."  (R.T. 41:14-17; R.T. 207:5-208:25)

1

2

3

4

5

          The showing of a single photo of a person to a witness for identification has been widely condemned, (See <u>Stovall v. Denno</u>, 388 U.S. 293; <u>Foster v. California</u>, 394 U.S. 440, 443) unless it occurs close in time and location of the crime. (<u>People v. Rodriguez</u>, 196 CA 3d 1044, 1049)  Because Swan had, for two months, the opportunity to view the lineup containing the same photo the prosecutor planned to show him, singularly, the danger of misidentification, based on the "retained[ed] memory of the image of the photo, rather than the person actually seen", was high.  (<u>Simmons v. United States</u>, 390 U.S. 383-384; See also <u>Foster v. California</u>, supra.)

[Doc. No. 1-1 at 13.]

6

7

8

9

10

11

     Respondent contends that the Petitioner's current challenge to the in-court identification of Mrs. Hill's photograph has not been presented to the California Supreme Court and, therefore, the claim has not been exhausted. [Doc. No. 16-1 at 21.] Nevertheless, Respondent requests that the Court address the unexhausted claim pursuant to <u>Cassett v. Stewart</u>, 406 F.3d 614, 623-624 (9th Cir. 2005).

12

13

14

     However, it appears to this Court that Petitioner has presented some semblance of this claim to the state courts.  In his final petition to the California Supreme Court, Petitioner argues the following:

15

16

17

18

19

20

          Finally, despite the unavailability of Patrice Hill and Sasha Doxey at trial, the prosecution solicited in-court identifications of them by the principal witness by introducing photos. The witness had failed, in a prior photo lineup, to identify Patrice Hill as someone at the scene.  Accordingly it was incumbent upon counsel to lodge an objection to the introduction of evidence damaging to his client. Absent an objection from counsel, the jury was left with the suggestion that Patrice Hill links petitioner to the crime scene.  Counsel should have objected to the admission of a photo of Patrice Hill (Exhibit 6), a witness who was never going to testify at trial.  Furthermore, witness Swan, who'd previously failed to choose Patrice Hill in a photo array, testified he was suddenly able to recognize her as being present.  (RT 457.)  Counsel should have objected and moved to suppress the identifications.  <u>Tomlin v. Myers</u>, 30 F.3d 1235 (9th Cir. 1994).

[Lodgment 19 at 12.]

21

22

23

24

     That petition to the California Supreme Court was summarily denied. [Lodgment 20.] However, Petitioner made a similar argument to the state appellate court. [Lodgment 17 at 12.] The appellate court, in denying the petition and, specifically, his ineffective assistance of counsel claim, stated the following:

25

26

27

28

     . . . Although Hill contends his trial counsel failed to object at key points in the trial, the trial court carefully analyzed this contention at the hearing on Hill's new trial motion.  The trial court found that, even if trial counsel had performed deficiently, the deficiency had not prejudiced the trial result.  Hill has not stated any facts or presented any evidence that undermines the trial court's finding.

[Lodgment 18 at 3.]

     In the underlying hearing on the motion for a new trial (where ineffective assistance of

09cv1327

1  counsel was raised as a basis for a new trial motion), the trial court had the following to say with

2  regard to the eyewitness identification issues when it denied the motion for new trial:

3      . . . I mean, we had already had a full frontal assault on the identification here in
        open court with Mr. Epley (Petitioner's trial counsel), I thought quite effectively,
4      impugning the integrity of the investigation by the detective, basically suggesting
        to the jury, very effectively, that they had served up Mr. Hill's head on a platter in
5      that six-pack lineup; and that through the information of the eyewitness
        identification expert, they made an as-plausible argument as anyone could that the
6      whole investigation reeked of undue suggestion of the identity of the perpetrator.  I
        thought that was pretty fairly and squarely presented to the jury, who obviously
7      didn't have much trouble with the information. . . .
            I will say one thing: I think Mr. Epley certainly focused the jurors' attention
8      on the credibility of their eyewitness identification.  He attached the eyewitness
        identification vigorously.  He demonstrated that the eyewitnesses, in fact, have
9      been untruthful with the police on certain specific parts of their story; that they
        were, in fact, potentially engaged in the commission of the crime when they were
10     soliciting prostitutes.  I think he clearly and carefully framed up the detective's
        inadequacies in maintaining some objectivity in presenting the eyewitness
11     identification.  I think he understood and argued that the eyewitness identification
        was suggestive, and his argument was coherent and presented directly to the jury.
12     He understood that the eyewitnesses were possibly under the influence of alcohol
        and presented that evidence clearly and framed the issue for the jury.
13  [Lodgment 2 at 547, 574, 575.]

14      Thus, it does appear that this issue has been presented to the state supreme court and,

15  therefore, exhausted.  However, even if  Petitioner has not exhausted state court remedies as to

16  this claim, this court may still review the claim pursuant to  Section 2254(b) (2) of the AEDPA,

17  which  provides that "[a]n application for a writ of habeas corpus may be denied on the merits,

18  notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

19  State." 28 U.S.C. § 2254(b)(2).  It is appropriate to reach the merits of habeas claims

20  notwithstanding the failure to exhaust available state remedies in those cases in which the

21  interests of comity and federalism will be better served by addressing the merits. Granberry v.

22  Greer, 481 U.S. 129, 134-35, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987). The Ninth Circuit,

23  adopting the standard set forth in Granberry, held that it is appropriate to deny an unexhausted

24  claim on the merits under § 2254(b)(2) when it is perfectly clear that the applicant does not raise

25  even a colorable federal claim. Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir.2005).

26  Because, as explained below, it is clear that Petitioner "has no chance of obtaining relief" on his

27  Sixth Amendment claim, the Court will exercise its discretion under § 2254(b)(2) and consider

28  the claim on its merits notwithstanding the possibility of Petitioner's failure to exhaust. Cassett,

    406 F.3d at 624.

Petitioner claims that it was error for trial counsel not to object to the identification by Swan of Petitioner's wife, and the introduction into evidence of her photograph (Exhibit 6). [Doc. No. 1-1 at 13.] First, there is no evidence to suggest that, had trial counsel objected to the introduction of Exhibit 6, the objection would have been sustained.  The standard for determining whether to suppress identification evidence is "that of fairness as required by the Due Process Clause of the Fourteenth Amendment." <u>Manson v. Brathwaite</u>, 432 U.S. 98, 113, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Identification evidence should be suppressed only in "extraordinary circumstances." <u>United States v. Watson</u>, 76 F.3d 4, 6 (1st Cir.1996).  Rather than a court suppressing identification evidence, "[c]ounsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi." <u>Clemons v. United States</u>, 133 U.S.App.D.C. 27, 48, 408 F.2d 1230, 1251 (1968) (concurring opinion) (footnote omitted), <u>cert. denied</u>, 394 U.S. 964, 89 S.Ct. 1318 (1969).

Here, trial counsel demonstrated (via extensive cross-examination and argument) the weaknesses of Swan's in-court identification. [Lodgment 2 at 207-209; 454-459.][5] For example, trial counsel pointed out during cross-examination of Mr. Swan that he (Swan) had failed to identify the woman in Exhibit 6 even though he had been sent a photographic lineup with her photo in it months earlier:

> Q: And then marking another exhibit as Court's Exhibit 11.  Do you also recognize this photographic lineup which is one page copy with six photos on it?
> A: Yes.
> Q:  And did you also receive that in the mail?
> A: Yes.
> Q: And there's six photographs there: is that correct?
> A: Correct.
> Q: They're black and white?
> A: Yes.
> Q: Do you recall receiving a color or a black and white copy of that?
> A: No, I don't recall it was black or white or color.
> Q: Okay.  In any regards, you received either a colored or black and white copy of that same exact paper.
> A: Yes.
> Q: And you had that in your possession at the same time as you had the

[5] Trial counsel also called an expert witness, Thomas R. MacSpeiden, to testify as to the unreliability of eyewitness identification in general. [Lodgment 2 at 293-351.]

09cv1327

1    other one, Court's Exhibit 3.
          A: Yes.
2         Q: And during the time that you had it, you had ample opportunity to review
     the six photographs to see if you recognized anybody in those photographs.
3         A; Yes.
          Q: And did you ever circle or identify any of those six people?
4         A: Girls?
          Q: Yes.
5         A: No.
          Q: Last night or early this morning, then, you were shown photographs
6    Court's Exhibit 5 and Court's Exhibit 6; is that correct?
          A: Yes.
7         Q: That's the first time you had seen those photographs as they are depicted
     in Court's 5 and Court's 6?
8         A: Yes.
          Q: And after you were shown them, now you say you can recognize those
9    two people.
          A: Yes.
10        Q: Drawing your attention back to Court's Exhibit 11.  In particular,
     looking at photograph No. 5.  Also drawing your attention to Court's Exhibit 6.
11        Do you see that that is the exact same photograph?
          A: Yes.
12        Q: And you previously, although you had that in your possession for two
     months, were unable to identify that person.
13        A: Yes.
          Q: It was only when you came here to San Diego and you talked to the
14   district attorney and were shown those photographs that now you say you
     remember Court's Exhibit 6; is that true?
15        A: Yes, but I wasn't supposed to circle on this unless I was a hundred
     percent sure.
16        Q: So you're telling us now that you've come to San Diego, you're a
     hundred percent sure?
17        A: No, not about the girl.
          Q: So you're not sure if the girl in Court's Exhibit 6 is the girl that was at
18   the beach.  The one behind you, Court's --
          A: Yeah.
19        Q: Are you sure whether or not that's the girl at the beach?
          A: Not one hundred, no.  I didn't talk to her.
20   [Lodgment 2 at 207-209.]

21        Trial counsel also pointed out the weakness of Swan's in-court identification of Exhibit 6

22   in closing argument:

23        We know that after these were sent – by the way, nobody ever picked
     photograph No. 5 out of this lineup, Court's Exhibit 11, the black and white.
24   Nobody ever picked the female out.  Although they had this in their possession.
     Mr. Naslund, for up to six months.  Who never did return it.  And Mr. Swan had it
25   in his possession until he returned it sometime in November or December of 2002,
     according to the testimony of Detective Steele.  We know that he signed the other
26   one and returned it along with this one after October 15th.  So he had it in his
     possession for several months, and he never identified a person here in this
27   photographic lineup.
          We know that after that October – I'm sorry – August 12th conversation I
28   just played, or played portions of, that there was no further contact verbally,
     according to the witnesses or Detective Steele, between the detective and the
     victims.  And the funny thing is then after Mr. Swan has this laying around his

                                    15                                   09cv1327

1   apartment for months and he never identifies anything – anyone, he comes to court
    here in San Diego.  He's flown out here to testify.  And after we pick a jury and
2   after opening statements, he's shown two court exhibits that have photos on them;
    and, lo and behold, he now can identify the two women that were at the beach,
3   where he previously never has.
            And if you listen to the full extent of the phone conversation that's in
4   evidence now, you'll hear that he was shown this photograph before and he didn't
    identify her.  And that's Court's Exhibit 5.  He didn't identify her when he was
5   shown this photograph before.
            And we know, then, that a photographic lineup was sent to him containing
6   this photograph, Court's Exhibit 6, which is depicted here in the lineup, Court's
    Exhibit 11.  And he had this for months and he did not identify her.  But when he
7   comes to California, when he comes here to testify and he talks to the prosecutor,
    after the opening statements, after we're picking a jury, he says, "These are the
8   girls?  Oh, yeah, yeah, those are the girls."
            Not too hard when you're being shown two on the eve of trial that are court
9   exhibits that obviously are prepared to go to trial.  Not a fair type of linup at all.
    It's not too hard to say, "yeah, they are them" and be sure.
10          What did Mr. Swan say when he sat right here on his direct testimony?  He
    said he was sure that was the girl that was there.  It was only when I cross-
11  examined him about the fact he had this photographic lineup in his possession for
    so long and didn't pick that, "Well, the reason I didn't pick that, I wasn't a
12  hundred percent sure."  He said, "Now I'm not a hundred percent sure still."  That
    was only on cross-examination.  That was only after it was pointed out to him that
13  he had this and he never picked her out.
            We know that if you listen, he saw a photo before, like I said.  Obviously,
14  Detective Steele wouldn't have sent him a photo he already failed to pick out.  So
    by reason of deduction, he saw photograph No. 5 before.  If you listen to that tape,
15  you'll see that.
            The evidence putting No. 6, Patrice Mechelle Hill, at the scene, at the scene
16  of this crime is very weak.  There is no evidence other than Swan's now in-court
    identification of her after he saw her Monday night in a photograph.  Other than
17  that, there is nothing at all to say No. 6 was at the crime scene.  There's no other
    witness that says she was there.  There's no other physical evidence.  Just that little
18  piece of evidence Swan saying that's her now.
            How strong is that?  Is there not a reasonable doubt whether or not she was
19  there?  So any rational conclusion that can be drawn from those, even if somehow
    you think that maybe she could have been, first of all, you have to establish that
20  she was there before you – beyond a reasonable doubt – before you can draw any
    rational conclusions.
21          The prosecutor wants you to believe, well, if she was there, then Mr. Hill
    was there.  That's the circumstantial evidence rule.  But even further than that,
22  there's been no evidence whatsoever of any connection between No. 5 and No. 6,
    the two women.  What evidence have you heard that connects those two women?
23  Zero.  Zip.  Except for that in – now in-court identification of the two photographs
    by Mr. Swan, there's nothing else.
24  [Lodgment 2 at 456-459.]

25          Trial counsel's decision not to object to the evidence and to demonstrate its flaws via

26  cross-examination, expert witness testimony and closing argument is a strategic trial decision

27  that "rests upon the sound professional judgment of the trial lawyer,"  Gustave v. United States,

28  627 F.2d 901, 904 (9th Cir.1980); and appropriately informed strategic choices "are virtually

    unchallengeable," Strickland, 466 U.S. at 690, 104 S.Ct. 2052.  Moreover, as discussed in

                                        16                                        09cv1327

1   Section IV.C.1. above, Petitioner is unable to show prejudice from trial counsel's decision not

2   object to the in-court identification, as the other evidence against Petitioner was strong.

3   Strickland, 466 U.S. at 687, 694;  Luna v. Cambra, 306 F.3d 954, 966 (9th Cir.), amended, 311

4   F.3d 928 (9th Cir.2002).  Therefore, this claim does not warrant habeas relief.

5   D.  Petitioner is not entitled to habeas relief for his claim that the trial court erroneously denied

6   Petitioner's motion for mistrial and new trial based on prosecutorial misconduct.

7        Petitioner claims that the trial judge erroneously denied the motions for new trial and

8   mistrial based on alleged prosecutorial misconduct. [Doc. No. 1 at 7.] Respondent argues that

9   this claim was reasonably rejected by the California Supreme Court and, therefore, there is no

10  basis for habeas relief. [Doc. No. 16-1 at 25 - 35.]

11       Petitioner presented his claim to the state supreme court in the petition for review of the

12  direct appeal.  [Doc. No. 1 at 6; Lodgment 6 at 7 - 24.]  The California Supreme Court

13  summarily denied the petition for review. [Lodgment 7.] In Y1st v. Nunnemaker, 501 U.S. 797,

14  804 (1991), the Court adopted a presumption which gives no effect to unexplained state court

15  orders but "looks through" them to the last reasoned state court decision.  Petitioner presented

16  his  claim to the appellate court in the same fashion it was presented to the state supreme court.

17  [Lodgment 3 at 6-15 ; Lodgment 6 at 7 - 24.] The appellate court denied the claim in a reasoned

18  opinion. [Lodgment 5 at 6-24.]

19       The Court will therefore look through the silent denial by the state supreme court to the

20  appellate court opinion.  The appellate court first provided a summary of the relevant procedural

21  background:

22       A.  *Prosecutorial Opening Statment*
         During his opening statement, the prosecutor argued that one of the

23  witnesses that the police interviewed at the crime scene, Doxey, gave a statement
    from which the police learned Hill's name as a suspect in this matter.  Doxey was

24  uncooperative with the police, and she was subpoenaed to testify at the trial but
    she was not willing to come to court.  Specifically, the prosecutor stated:

25       "Well, after the incident, police officers interviewed a number of
         witnesses down at the crime scene.  One of them was a person by the

26  name of Sasha Doxey.  She gave a statement to the police the night
    of the incident, and Detective Steele followed up on that and went

27  and spoke with Miss Doxey at her house and he took her statement.
    [¶] She was not real enthusiastic, not real cooperative with Detective

28  Steele, but she gave Detective Steele information about what she was
    doing, who she was with; and, based on that information, the police
    developed a suspect.  They learned Mr. Hill's name. [¶] The police

                                           17                                          09cv1327

put together what's called a photographic lineup.

Photographic lineup is – and this is one of them.  There are two – where there's six individuals' pictures who are compiled.  One is the suspect, in this case, Mr. Hill . . . ."

Later during his opening statement, the prosecutor commented on the unavailability of Doxey as a witness:

"Miss Doxey, it's uncertain whether or not she'll testify.  First of all, she was uncooperative with the police."

Hill's trial counsel objected to this statement on the ground it constituted an "improper argument."  The court sustained this objection.

The prosecutor immediately continued with his opening statement to the jury, stating that Doxey was unwilling to testify in this matter:

"Well, the evidence will show that Miss Doxey was served [with] a subpoena to come to court to testify and has not been located.  She's not willing to come to court."

After both the prosecutor and defense counsel gave their opening statements, the court excused the jury.  Defense counsel expressed concern about the prosecutor's mention of Doxey and Patrice Hill during his opening statement:

"My concerns are in his opening[;] it led – you know, he's identifying [Doxey] and [Patrice] Hill.  And the only way they can identify those people, you know, is based upon her statements, I think.  So [Doxey] is the one that gave them the identification."

Defense counsel also expressed concern that Detective Steele might testify about Doxey's hearsay statements to him.  In light of both Doxey's expected unavailability as a witness and the lack of a hearsay exception permitting her statements to the police to be admitted into evidence, the court advised the prosecutor to exercise caution in eliciting testimony from Detective Steele.  The prosecutor told the court he would admonish Detective Steele not to testify about Doxey's statements, and the court indicated the prosecutor could elicit testimony showing that Doxey was present at the crime scene.  The court also cautioned the prosecutor that Hill's relationship with the two women (Doxey and Patrice Hill) would have to be established by competent evidence.

B.  *Hill's Motion for Mistrial*

The next day, out of the presence of the jury and before the first prosecution witness (Naslund) testified, defense counsel moved for a mistrial based on the prosecutor's opening statement.  He argued that the prosecutor had violated Hill's constitutional confrontation rights by stating during his opening statement that Doxey had been served with a subpoena and was fleeing, and that based on her statements the police had prepared a photo lineup that included a photograph of Hill so that the victims could identify him.  Defense counsel also argued that the prosecutor had engaged in intentional misconduct to either "goad" the defense into moving for a mistrial or to put highly prejudicial information before the jury, and thus the mistrial should be with prejudice so as to bar a retrial.  In the alternative, defense counsel asked the court to give a curative instruction defense had prepared to try to cure the "highly prejudicial evidence which came in through the way of the [prosecutor's] testimony during opening statement."

The court rejected the notion that *evidence* had been presented to the jury during the prosecutor's opening statement, noting that it had carefully advised the jury that what was said during opening statements could not be considered as evidence.  Rejecting a curative instruction proposed by the defense, the court deferred its ruling on the mistrial motion until there was a break in the testimony, but cautioned the jury as follows, before Naslund testified, that the prosecutor's opening statement was not evidence:

"Let me remind you of some things that we've already talked about in this case. [¶] First.  The decision in this case . . . . has to be made upon the evidence that's received in this trial and not from any other source of information.  Not from anything else. [¶] *We have not yet*

*heard one word of evidence. Everything so far has simply been statements of counsel or discussions with the court. None of it's evidence.* The evidence comes from the witnesses, from the documents, from the other things that are received into evidence. And you make your decision based upon the facts that are demonstrated by that evidence. [¶] So now, *I don't know if any of you took any notes of any kind. Draw a nice big line there. Everything above that line is not evidence and now we're ready to start with evidence.*" (Italics added.)

Later that same morning, before the second prosecution witness (Swan) completed his testimony on direct examination, the court excused the jury for a lunch recess and then addressed Hill's mistrial motion. Abandoning his request for a curative instruction, defense counsel modified the motion to be one for mistrial with prejudice or, alternatively, for mistrial without prejudice.

C. *Ruling Denying Hill's Mistrial Motion*

Applying the prejudicial misconduct analysis explained in *People v. Barajas* (1983) 145 Cal.App.3d 804 (*Barajas*) (discussed, *post*), the court found the prosecutor committed misconduct during his opening statement by stating that Doxey was at the crime scene and by suggesting that she made a statement that caused the police to suspect Hill in this matter because such misconduct placed Doxey's inadmissible hearsay statements before the jury. The court also found the prosecutor committed misconduct by speculating about Doxey's state of mind and her attitude about testifying. Specifically, the court indicated it was misconduct to argue to the jury that Doxey was uncooperative with the police, that she was served with a subpoena and had not been located, and that she was not willing to come to court to testify. The court further indicated the prosecutor's statements could reasonably be interpreted to mean that Doxey had "fingered" Hill as the perpetrator and that she was either in some danger for doing so or her statements against Hill were extremely reliable.

The court found, however, that to the extent the prosecutor had engaged in misconduct, he had inadvertently failed to appreciate that his remarks to the jury implied the contents of Doxey's statements to the police, and thus he had not acted in bad faith. The court also found that to the extent the prosecutor had enaged in misconduct during his opening statement, the "limited prejudice" to Hill by reference to Doxey was mitigated by the fact that one of the victims (Swan) had identified Doxey, and the police had found Doxey near the crime scene when they arrived there. Concluding that to the extent the prosecutor had committed misconduct it was not prejudicial, the court denied Hill's mistrial motion.

D. *Detective Steele's Testimony*

After Detective Steele identified court exhibit No. 5 as a photograph of Doxey, the prosecutor asked him whether he ever contacted Doxey. Detective Steele replied, "Yes, sir, I did. Several times." Defense counsel objected on relevance and Sixth Amendment grounds. The court sustained the objection on relevance grounds and granted the defense's motion to strike the references to Doxey.

The prosecutor then asked Detective Steele whether, as a result of his investigation, he prepared a photographic lineup containing a photograph of Hill. Detective Steele replied he had prepared such a lineup, and he sent it to both Naslund and Swan after they returned to Sweden. Detective Steele indicated that both Naslund and Swan correctly identified Hill from the photographic lineup.

Later, outside the presence of the jury, defense counsel expressed concern about the prosecutor's questions to Detective Steele as to whether he had contacted Doxey and whether based on his investigation he sent to the victims a photographic lineup containing a photograph of Hill. Defense counsel asserted there were grounds for finding prosecutorial error and declaring a mistrial because the order of the prosecutor's questions implied that Doxey had identified Hill.

The court found there was no obvious or logical nexus between Doxey and

19

any information she gave.  The court noted that it had stricken the references to Doxey, and it had admonished the jury.

The prosecutor explained that he was simply eliciting the fact that Detective Steele met and saw Doxey.  Regarding Detective Steele's "unsolicited comments," the prosecutor explained he had warned Detective Steele that they were not getting into any statements made by Doxey.  Regarding the photographic lineup and the order of his questions, he stated he did not intend to establish any kind of nexus.  The court stated it was going to continue to monitor the situation and found that Hill had not been prejudiced.

E.  *Final Cautionary Instructions to the Jury*

In its final instructions to the jury prior to its deliberations, the court gave CALJIC No. 1.02 (discussed, *post*), cautioning again that "statements made by the attorneys during the trial are not evidence" and reminding the jury that "if anything has been said in opening statement for which there is no evidence that has been received in this trial, it is improper to consider or discuss those matters."

F.  *Hill's New Trial Motion*

The court revisited the issue of prosecutorial misconduct at the hearing on Hill's new trial motion.  In his motion papers, Hill claimed in part that he had been denied a fair trial because the prosecutor had engaged in "egregious" misconduct during his opening statement and his questioning of Detective Steele.

Indicating it was mindful of Supreme Court pronouncements that defendants are entitled to fair trials, not perfect trials, the court found that the prosecutor had committed misconduct during his opening statement by suggesting to the jury the inadmissible hearsay contents of Doxey's statements to the police and by further suggesting that Doxey was reluctant to cooperate and was not willing to come to court.  The court stated it had adequately addressed the misconduct by repeatedly making sure the jury understood that statements by the attorneys were not evidence.

The court found that Detective Steele's conduct in referring to Doxey was "reprehensible," but noted it had addressed it by striking Detective Steele's answers and instructing the jury not to consider or discuss his answers.  The court also found that Hill was not prejudiced by any of the instances of prosecutorial misconduct, concluding it was not reasonably probable there would have been a more favorable result had the misconduct not occurred.  The court found that Hill had received a fair trial and denied his new trial motion.

[Lodgment 5 at 6-13.]

The appellate court then made the following analysis:

Hill contends the court erred by denying his request for a mistrial, and his conviction should be reversed because the prosecutor committed prejudicial misconduct by suggesting to the jury during his opening statement that Doxey gave a statement from which the police learned Hill's name as a suspect in this matter and by stating that she was uncooperative with the police and subpoenaed to testify at the trial but was not willing to come to court.  The prosecutor's statements, Hill maintains, violated his right to confrontation under the Sixth and Fourteenth Amendments to the United States Constitution, [6] and prejudicially suggested to the jury that Doxey had fingered him as the perpetrator.  We conclude, for reasons we shall explain, that although the prosecutor committed misconduct, the misconduct was not prejudicial, and thus the court did not abuse its discretion by denying Hill's

---

[6] [Footnote in original] "The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witness against him.'  The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, [citation],'means more than being allowed to confront the witness physically.' [Citation.] Indeed, "'[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*.'" [Citation.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678 (*Van Arsdall*.))

09cv1327

request for a mistrial.

       A.  *Applicable Legal Principles*

A motion for mistrial is directed to the sound discretion of the trial court and should be granted if the court is apprised of prejudice it deems incurable by admonition or instruction. (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.) "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]" (*Id.* at p. 986.) "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial. [Citation.]" (*People v. Silva* (2001) 25 Cal.4th 345, 372.)

"Unquestionably, the prosecution may in its opening statement refer to evidence which it believes will be produced. [Citation.]" (*Barajas, supra*, 145 Cal.App.3d at p. 809.) Thus, "remarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted."' [Citation.]" (*People v. Wrest* 91992) 3 Cal.4th 1088, 1108; see also *People v. Rhinehart* (1973) 9 Cal.3d 139, 154, disapproved on other grounds in *People v. Bolton* (1979) 23 Cal.3d 208, 213-214.)

"While the test for determining prejudice arising from a variance between the opening statement and the proof is no longer bad faith, three tests determine if a defendant has been prejudiced. First, was an objection lodged or a motion *in limine* made? [Citations.] Second, was the jury informed by the court or by the prosecution [that an] opening statement is not evidence? [Citations.] Third, did [the] opening statement result in a violation of the defendant's Sixth Amendment right to confrontation? [Citation.]" (*Barajas, supra*, 145 Cal.App.3d at p. 809, fn. omitted.)

Constitutional error in denying a criminal defendant's right to cross-examine an adverse witness under the confrontation clause of the Sixth Amendment "does not fit within the limited category of constitutional errors that are deemed prejudicial in every case." (*Van Ardsll, supra*, 475 U.S. at p. 682.) Confrontation clause errors are reviewed under the harmless-error standard announced in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*Van Ardall, supra*, 475 U.S. at pp. 680, 684; *Barajas, supra*, 145 Cal.App.3d at p. 810 ["where prosecutorial misconduct invades a constitutionally protected right, the error must be evaluated in light of *Chapman*[, *supra*,] 386 U.S. 18"].)

In *Van Arsdall* the United States Supreme Court explained that in *Chapman* it "rejected the argument that all federal constitutional errors, regardless of their nature or the circumstances of the case, require reversal of a judgment of conviction. The Court reasoned that in the context of a particular case, certain constitutional errors, no less than other errors, may have been 'harmless' in terms of their effect on the factfinding process at trial. Since *Chapman*, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. [Citations.]" (*Van Arsdall, supra*, 475 U.S. at p. 681.)

In *Van Arsdall*, the trial court prohibited *all* inquiry by the defense into the possibility that a prosecution witness would be biased as a result of the State's dismissal of his pending public drunkenness charge. (*Van Arsdall, supra*, 475 U.S. at pp. 674, 679.) The high court in *Van Arsdall* explained that in such a case, under the *Chapman* harmless-error standard of review, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends on a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-

examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [Citations.]" (*Van Arsdall, supra,* 475 U.S. at p. 684.)

B. *Analysis*

1. *Misconduct*

As a preliminary matter, we affirm the finding of the court that the prosecutor committed misconduct during his opening statement, after stating that Doxey was at the crime scene, by suggesting that she made a statement to the police that caused them to suspect Hill and put his photograph in the photographic lineup. The prosecutor did not discuss the specific nature of Doxey's statements to the police. However, he acknowledged that Doxey was unwilling to testify at trial. The prosecutor engaged in misconduct by stating to the jury in his opening statement that Doxey had given statements to the police during the investigation that caused Hill to become a suspect, knowing that the defense would be unable to cross-examine Doxey with respect to her statements to the police because she would be unavailable at trial. Doxey's hearsay statements were "'"so patently inadmisible as to charge the prosecutor with knowledge that [they] could never be admitted"'" (*People v. Wrest, supra,* 3 Cal.4th at p. 1108) and that it was improper to mention them to the jury.

We also affirm the court's finding that the prosecutor committed misconduct again during his opening statement by indicating that Doxey was uncooperative with the police, that she was served with a subpoena and had not been located, and that she was not willing to come to court to testify. The court properly found that the prosecutor's statements could reasonably be interpreted by the jury to mean that Doxey had fingered Hill as the perpetrator, and that either she was in some danger for doing so, or that her statements against Hill were extremely reliable. We note and affirm the court's additional finding that to the extent the prosecutor engaged in misconduct, he had inadvertently failed to appreciate that his remarks to the jury implied the contents of Doxey's statements to the police, and thus he had not acted in bad faith.

2. *Right to Confrontation and Prejudice*

Next, we must decide the issues of whether the prosecutor's misconduct violated Hill's constitutional confrontation rights, and whether the prosecutor's misconduct and the variance between his opening statement and the evidence presented to the jury were prejudicial so as to warrant the declaring of a mistrial. In deciding these issues, we apply the three-prong test (the *Barajas* test) explained in *Barajas, supra,* 145 Cal.App.3d at page 809 (discussed, *ante*). With respect to the first prong – whether the defense lodged an objection or brought a motion in limine – we conclude the defense met its burden of lodging an objection to the prosecutor's remarks. Defense counsel expressed concern outside the presence of the jury after both the prosecution and the defense gave their opening statements. Specifically, defense counsel expressed concern about the prosecutor's mention of Doxey and Patrice Hill during his opening statement, stating: "My concerns are in his opening[;] it led – you know, he's identifying [Doxey] and [Patrice] Hill. And the only way they can identify those people, you know, is based upon her statements, I think. So [Doxey] is the one that gave them the identification." The next day, out of the presence of the jury and before the first prosecution witness testified, defense counsel moved for a mistrial based on the prosecutor's opening statement. Thus, the first prong of the *Barajas* test is satisfied.

With respect to the second prong of the *Barajas* test – whether the jury was informed that an opening statement is not evidence – the record shows that both before and after the prosecutor's improper opening statement, the court repeatedly admonished the jury that it must not consider as evidence any statement made by the attorneys. For example, immediately before the prosecutor gave his opening statement, the court instructed the jury: "Remember at all times that the attorneys are not witnesses. And since it is your duty to decide the case solely on the evidence which you see or hear in this case, you must not consider as evidence any statement made by an attorney during the course of the trial." Noting that the most

22

significant exception to the "hard and fast rule" that "what the attorneys say is not evidence" is the exception that applies to stipulations that certain facts are true, the court again instructed the jury before the prosecutor's opening statement that an attorney's opening statement is not evidence.

The record also shows that after the defense requested a mistrial and before Naslund testified, the court cautioned the jury that the prosecutor's opening statement was not one word of evidence. Specifically, the court admonished the jury that "[w]e have not yet heard one word of evidence. Everything so far has simply been statements of counsel or discussions with the Court. None of it's evidence." The court also stated to the jury, "I don't know if any of you took any notes of any kind. Draw a nice big line there. Everything above that line is *not evidence* and *now we're ready to start with the evidence*." (Italics added.) (2RT 55:12-15)!

Last, in its final instructions to the jury prior to its deliberations, the court instructed the jury under CALJIC No. 1.02 that "statements made by the attorneys during the trial are not evidence."[7] and reminded the jury that "if anything has been said in opening statement for which there is no evidence that has been received in this trial, it is improper to consider or discuss those matters."

We reject Hill's claim that the second prong of the *Barajas* test is satisfied because in this case, as in *Barajas*, the prosecutor did not inform the jury that his opening statement was not evidence, and the court instructed the jury under CALJIC No. 1.02. It is true that the prosecutor in the instant case, like the prosecutor in *Barajas* (see *Barajas, supra,* 145 Cal.App.3d at pp. 809-810), did not inform the jury that his opening statement was not evidence. However, *Barajas* is distinguishable with respect to the instructions the trial court gave to the jury on this issue. There, the Court of Appeal found that the trial court's *only* relevant instruction informed the jury under CALJIC No. 1.02, in the context of disregarding sustained objections, that "statements made by the lawyers during the court of this trial are not evidence." (*Barajas, supra*, 145 Cal.App.3d at p. 810, fn. 9.) Here, in contrast (as discussed, *ante*) the court went well beyond the sole relevant instruction given in *Barajas* and informed the jury, before the first witness took the stand to testify, that the opening statements were not evidence. At that point in the proceedings, the court also stated to the jury, "[N[ow we're ready to start with the evidence." (2 RT 55:14-15)! As already noted, the court also reminded the jury in its final instructions after the parties rested that "if anything has been said in opening statement for which there is no evidence that has been received in this trial, it is improper to consider or discuss those matters." Because the court repeatedly admonished the jury that an opening statement is not evidence, and we presume the jury understood that any information conveyed in prosecutor's opening statement could not be considered as evidence, we conclude the second prong of the *Barajas* test is not satisfied.

Turning to the third and final prong of the *Barajas* test – whether the prosecutor's opening statement resulted in a violation of the defendant's Sixth Amendment right to confrontation – the record shows that although the prosecutor's opening statement could reasonably be interpreted as suggesting that Doxey had identified Hill as the robber, the jury heard the testimony of victim Swan, whose eyewitness identification of Hill as the robber was solid and credible. Swan testified that before his visit to San Diego, he had been studying at the

---

[7][Footnote in original] CALJIC No. 1.02 provides: "*Statements made by the attorneys during the trial are not evidence.* [However, if the attorneys have stipulated or agreed to a fact, you must regard that fact as proven [as to the party or parties making the stipulation].] [¶] If an objection was sustained to a question, do not guess what the answer might have been. Do not speculate as to the reason for the objection. [¶] Do not assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it helps you to understand the answer. Do not consider fro any purpose any offer of evidence that was rejected, or any evidence that was stricken by the court; treat it as though you had never heard of it." (Italics added.)

Swedish police academy and had learned how to recognize the perpetrator of a crime by staying calm and then looking for specific characteristics such as the hairline, eyes, eyebrows, mouth, nose and the whole body, as well as the perpetrator's language, attitude, accent, and manner of acting. He also testified that when he realized that he and Naslund were being robbed, he thought to himself, "I have to remember this guy." He testified in detail how he applied what he had learned at the academy and repeatedly took note of Hill's features at virtually every phase of the robbery and shooting. Swan identified Hill as the robber in the photographic lineup he received from Detective Steele. He also identified Hill as the robber in the courtroom during the trial.

Naslund also identified Hill both in the photographic lineup and in the courtroom at time of trial. Although Naslund admitted he was inebriated at the time of the robbery, the jury could reasonably credit his identification of Hill in light of Swan's solid testimony and other corroborating evidence. For example, Officer Pottin testified that when he found Swan lying on the sidewalk near the roller coaster with blood on his left leg, Swan told him that he had been shot by a Black male in his 30's who was about 170 to 175 centimeters (about five feet six inches to five feet eight inches) tall. [Footnote omitted.] The parties stipulated that Hill is just under 5 feet 6 inches tall. The record shows that at the time of the robbery in July 2002, Hill, who is Black, was almost 36 years of age. Furthermore , Officer Kong testified that the photograph marked as court exhibit No. 5 depicted Doxey, whom Officer Kong had interviewed at the crime scene. When shown the same photograph at trial, Swan identified the woman in the photograph (Doxey) as the "tall" woman he and Naslund had met in Mission Beach earlier on the night of the robbery. The court did not abuse its discretion by finding that to the extent the prosecutor had engaged in misconduct during his opening statement, the "limited prejudice" to Hill by the reference to Doxey was mitigated by the fact that Swan had identified Doxey, and the police had found Doxey near the crime scene when they arrived there. In light of the foregoing record and the court's repeated admonitions to the jury to disregard the prosecutor's improper remarks during his opening statement, we conclude Hill's constitutional right to confrontation was not violated, and the prosecutor's misconduct was not prejudicial.

Our conlusion is supported by the decision in *Frazier v. Cupp* (1969) 394 U.S. 731 (*Frazier*). In that case, the defendant was indicted jointly with his cousin Rawls, who pleaded guilty before trial. (*Id.* at p. 733.) In his opening statement, the prosecutor summarized the testimony he expected from Rawls, but he did not emphasize the summary in any particular way, and he took only a few minutes to recite it. (*Ibid.*) At one point during the summary, the prosecutor referred to a paper he was holding, in order to refresh his recollection about something Rawls had said. (*Id.* at p. 734.) The defense made a motion for mistrial at the end of the opening statement, and the trial court denied the motion. (*Ibid.*) The Supreme Court noted that the jury "might fairly have believed that the prosecutor was referring to Rawls' statement" when he referred to the paper in his hand. (*Ibid.*) At trial, Rawls asserted his privilege against self-incrimination in front of the jury when called to the stand to testify. (*Ibid.*)

In a unanimous opinion by Justice Marshall, the Supreme Court found no Sixth Amendment violation, noting that the codefendant's statement was placed before the jury "not during the trial, while the person making the statement was on the stand, but in an opening statement. In addition, *the jury was told that the opening statement should not be considered as evidence.*" (*Frazier, supra,* 394 U.S. at p. 735, italics added.) Further, the court observed that "the jury was not being asked to perform the mental gymnastics of considering an incriminating statement against only one of two defendants in a joint trial." (*Ibid.*) The court also noted that Rawls' statement was "not a vitally important part of the prosecution's case." (*Ibid.*) The *Frazier* court concluded:

"We believe that in these circumstances *the limiting instructions given were sufficient to protect petitioner's constitutional rights . . . .*

09cv1327

It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable.  But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce.  Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance.  Certainly *not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given* . . . . [I]t does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial.  As [sic] least where the anticipated, and unproduced, evidence is not touted to the jury as a crucial part of the prosecution's case, 'it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately.'" (*Id.* at pp. 735-736, italics added, fn. omitted.)

State and federal courts following *Frazier, supra,* 394 U.S. 731, have almost uniformly found no confrontation clause violation in circumstances where the prosecutor was unable to prove facts recited in good faith during opening statement, and where the jury was properly instructed that the statements of counsel are not evidence.  (See, e.g., *People v. Hernandez* (1970) 11 Cal.App.3d 481, 488-491; *United States v. Campbell* (6th Cir. 2003) 317 F.3d 597, 606-607; *United States v. Akins* (7th Cir. 1977) 562 F.2d 459, 464-466.)

Here, as in *Frazier, supra,* 394 U.S. at page 735, the prosecutor's improper remarks concerning Doxey during his opening statement were not a crucial part of the prosecution's case, particularly in light of the solid eyewitness testimony of one of the victims (Swan); and the trial court repeatedly instructed the jury that the statements of counsel, including the prosecutor's opening statement, were not evidence, that the jury had to decide the facts based solely on the evidence, and that the evidence was limited solely to the testimony of the witnesses and the exhibits received.  As discussed earlier, the evidence was sufficient to support the convictions without Doxey's statements or testimony.  In these circumstances, we see no reason to depart from the usual assumption "that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial."  (*Id.* at p. 736.)  Under the holding and reasoning of *Frazier,* we conclude Hill suffered no Sixth Amendment violation and no incurable prejudice arising from the prosecutor's opening statement.

[Lodgment 5 at 13-24.]

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. See <u>Darden v. Wainwright</u>, 477 U.S. 168, 182-83, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); <u>Smith v. Phillips</u>, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under <u>Darden</u>, "the first issue is whether the prosecutor's remarks were improper and, if so, whether they infected the trial with unfairness." <u>Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir.2005). A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a

09cv1327

1   denial of due process." Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation and

2   quotation omitted), cert. denied, 516 U.S. 1017, 116 S.Ct. 582, 133 L.Ed.2d 504 (1995).

3          Here, a review of the underlying record shows that, while the prosecutor did engage in

4   misconduct, it did not "infect[] the trial with unfairness." Tan v. Runnels, 413 F.3d at 1112.

5   Before opening statement, the trial court admonished the jury that attorneys are not witnesses and

6   that any statements made by attorneys during the course of the trial are not evidence. [Lodgment

7   2 at 7, 18, 19.]  During opening statement, the prosecutor stated the following:

8            Well, after the incident, police officers interviewed a number of witnesses
         down at the crime scene.  One of them was a person by the name of Sasha Doxey.
9        She gave a statement to the police the night of the incident, and Detective Steele
         followed up on that and he went and spoke with Miss Doxey at her house and he
10       took her statement.
             She was not real enthusiastic, not real cooperative with Detective Steele, but
11       she gave Detective Steele information about what she was doing, who she was
         with; and, based on that information, the police developed a suspect.  They learned
12       Mr. Hill's name. . . .

13           Ms. Doxey, it's uncertain whether or not she'll testify.  First of all, she was
         uncooperative with the police.
14  [Lodgment 2 at 23, 24]

15         At this point, defense counsel objected as improper argument and the court sustained his

16  objection. [Lodgment 2 at 24.]  While it denied defense counsel's subsequent motion for a

17  mistrial [Lodgment 2 at 171-176], the trial court again admonished the jury prior to the start of

18  testimony that statements by the attorneys during opening statement are not evidence. [Lodgment

19  2 at 54-55.]  Later in the trial, Detective Steele commented that he had contacted Doxey several

20  times. [Lodgment 2 at 236.]   Defense counsel objected and moved to strike the testimony. [Id.]

21  The trial court sustained the objection and granted the defense's motion to strike the references to

22  Doxey. [Id. ]  Finally, during final instructions, the trial court again instructed the jury that (1)

23  statements made by attorneys during the trial are not evidence; (2) anything said in opening

24  statement for which no evidence was received during trial was improper to consider and (3) they

25  were not to consider any evidence stricken by the court . [Lodgment 2 at 409-410; Lodgment 1 at

26  12.] Thus, while there was prosecutorial misconduct, the curative instructions by the trial court

27  made it such that the trial was not "infected . . .  with unfairness." Tan v. Runnels, 413 F.3d at

28  1112.

           Moreover, Petitioner cannot show actual prejudice from the misconduct.  To prevail on a

1   claim for habeas relief based on trial error, the petitioner must establish that it resulted in actual

2   prejudice, that is, that the error "had substantial and injurious effect or influence in determining

3   the jury's verdict." <u>Brecht</u>, 507 U.S. at 637-38 (citing <u>Kotteakos v. United States</u>, 328 U.S. 750,

4   776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).  Here, there was other evidence that linked Doxey to

5   the crime scene.  One of the victims, Swan, was able to identify Doxey from a photograph

6   [Lodgment 2 at 127], and the police found Doxey near the crime scene when they arrived there

7   [Lodgment 2 at 221-222 ].  Finally, as discussed in Section IV.C.1. above, there was other

8   evidence implicating Petitioner, including the eyewitness testimony of the victims.  Therefore,

9   there is no indication that the prosecutorial misconduct had a "substantial and injurious effect" on

10  the jury's verdict.  <u>Id</u>.   Accordingly, the Court finds that the California court's rejection of

11  Petitioner's claim was neither contrary to, nor involved an unreasonable application of, clearly

12  established federal law, as determined by the United States Supreme Court.  Thus, habeas relief is

13  not warranted on this claim.

14  E.  <u>Petitioner is not entitled to habeas relief for his claim that he should be granted a new trial</u>

15  <u>based on newly discovered evidence.</u>

16          Petitioner argues that he should have been granted a new trial based on newly discovered

17  evidence. [Doc. No. 1 at 8.] According to Petitioner, there are three new witnesses who were at

18  the scene and could testify that Petitioner was not the shooter. [<u>Id</u>.] Specifically, Petitioner

19  alleges:

20          On June 10, 2003 Petitioner discovered three (3) new witnesses Kenneth
            Bess, Adam Nuno, and Bianca Towne, (See Exhibits C, D) who were at the scene
21          during the incident.  They are prepared to testify 1) that they heard the gunshot and
            witnessed a Black male (the shooter) exit the restroom immediately afterwards,
22          followed by the two victims; 2) that they had had a conversation with the same
            Black male earlier in the day, before the shooting occurred; and 3) that although he
23          favors the man they spoke to, and later saw leaving the scene of the shooting,
            petition [sic] was not, in fact, that person.

24  [Doc. No. 1 at 8.]

25          Respondent contends that the state courts reasonably rejected Petitioner's claim of actual

26  innocence based on purportedly exonerating "newly discovered" evidence and that, therefore, no

27  habeas relief is warranted. [Doc. No. 16-1 at 35 - 36.]

28          Petitioner presented his claim of actual innocence to the state supreme court in the

    petition for review. [Doc. No. 1 at 8; Lodgment 19 at 22-26.] The California Supreme Court

1  summarily denied the petition for review. [Lodgment No. 20.] In Y1st v. Nunnemaker, 501 U.S.

2  797, 804 (1991), the Court adopted a presumption which gives no effect to unexplained state

3  court orders but "looks through" them to the last reasoned state court decision.  Petitioner

4  presented his  claim to the appellate court in the same fashion it was presented to the state

5  supreme court. [Lodgment 17 at 22-25; Lodgment 19 at 22-26.] The appellate court denied the

6  claim in a reasoned opinion. [Lodgment 18 at 4-5.]

7       The Court will therefore look through the silent denial by the state supreme court to the

8  appellate court opinion.  The appellate court stated:

9            Finally, regarding Hill's newly discovered evidence claim, such evidence is
   only a basis for habeas relief if it undermines the prosecutions' entire case.  It is not
10  sufficient that the evidence might have weakened the prosecution case or presented
   a more difficult question for the jury.  The evidence must cast fundamental doubt
11  on the accuracy and reliability of the proceedings and point unerringly to innocence
   or reduced culpability.  (In re Clark, supra, 5 Cal.4th at p. 766.)
12            In this case, most of the "new evidence" submitted by Hill consists of
   statements from people who witnessed Hill living in Long Beach with
13  his grandmother during the summer when the robberies occurred.  There is also an
   unauthenticated report prepared by an investigator who had surveilled Hill's
14  grandmother's home (for unrelated reasons) a week after the robberies.  The report
   notes the presence of an African-American man and an African-American woman
15  in their late 20's or early 30's in the grandmother's home.  None of this evidence
   establishes Hill's precise whereabouts on the date of the robberies.  Therefore, none
16  of this evidence undermines the prosecution's entire case and points unerringly to
   Hill's innocence.
17            The remaining "new evidence" provided by Hill is similarly unhelpful.  It
   consists of facially defective declarations from three people who purportedly
18  overheard the shooting portion of the robberies.  The three people did not see Hill
   in the vicinity at the time, but they saw another African-American male that looked
19  like Hill.  They believe this other African-American male committed the crimes.
   Hill discovered this evidence when he met one of the three in a court holding cell
20  during posttrial proceedings.  As the two men were discussing their respective
   cases, the other man realized that he and two of his friends had witnessed the
21  crimes for which Hill had been convicted.  This evidence, had it been available and
   presented at trial, might have weakened the prosecution case or presented a more
22  difficult question for the jury.  However, like the new alibi evidence described
   above, the evidence does not undermine the prosecution's entire case and point
23  unerringly to Hill's innocence.  Accordingly, it is not sufficient to state a prima
   facie case for relief.
24  [Lodgment 18 at 4-5.][8]

25       In Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), a majority of

26  the United States Supreme Court assumed without explicitly deciding that the execution of an

27  _____

28       [8]Much of this "new evidence" was also presented to the trial court at the hearing on the motion
   for a new trial. [Lodgment 2 at 527-584.] In denying the motion for new trial based on newly discovered
   evidence [Lodgment 2 at 584], the trial court pointed out that none of these witnesses claim to have
   observed the shooting personally [Lodgment 2 at 530, 576-577].

09cv1327

1   innocent person would violate the Constitution, but the Court did not specify what kind of

2   showing a habeas petitioner would have to make to successfully present such a claim. Herrera,

3   506 U.S. at 400. Herrera noted that "[c]laims of actual innocence based on newly discovered

4   evidence have never been held to state a ground for federal habeas relief absent an independent

5   constitutional violation occurring in the underlying state criminal proceeding." Id. The Ninth

6   Circuit has concluded that Herrera requires a petitioner making a "freestanding claim of

7   innocence" to affirmatively prove he is probably innocent. Turner v. Calderon, 281 F.3d 851, 872

8   (9th Cir.2002); Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir.1997). " '[A]ctual innocence'

9   means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614,

10  623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

11          Petitioner has not "affirmatively proved he is probably innocent" of the charges of which

12  he was convicted, and as discussed in Section IV.C.1. above, there is more than sufficient

13  evidence in the record that proves his guilt. See Carriger, 132 F.3d at 476.  As pointed out by the

14  state courts, while two of the "new" witnesses claim that they heard the shooting and then saw a

15  Black male in a white jumpsuit leave the bathroom, none of them claim to have personally

16  observed the shooting. [Doc. No. 1-2 at 57-64.]  On the other hand, the two victims in this case

17  did personally observe the shooting and were able to identify the Petitioner from a photo lineup.

18  [Lodgment 2 at 79-85, 183-186.]  This evidence is sufficient for this Court to conclude that

19  Petitioner has not established he is probably innocent of the charges for which he was convicted.

20  See Turner, 281 F.3d at 872. Petitioner has not established his freestanding claim of innocence

21  nor has he established actual innocence based upon newly discovered evidence in a criminal

22  proceeding infected by a constitutional violation. See Turner, id. Accordingly, the Court finds

23  that the California court's rejection of Petitioner's claim was neither contrary to, nor involved an

24  unreasonable application of, clearly established federal law, as determined by the United States

25  Supreme Court. Thus, habeas relief is not warranted on this claim.

26                              V. CONCLUSION

27          For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an

28  Order: (1) approving and adopting this Report and Recommendation; and (2) directing that

Judgment be entered denying the Petition for Writ of Habeas Corpus.

1    **IT IS ORDERED** that no later than **June 21, 2010**, any party to this action may file

2  written objections with the Court and serve a copy on all parties.  The document should be

3  captioned "Objections to Report and Recommendation."

4    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

5  Court and served on all parties no later than **July 6, 2010.**  The parties are advised that failure to

6  file objections within the specified time may waive the right to raise those objection on appeal of

7  this Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst,

8  951 F.2d 1153, 1156 (9th Cir. 1991).

9

10  DATED:  May 18, 2010

11

12                                                    **CATHY ANN BENCIVENGO**
                                                    United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09cv1327